**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | No. 17-cr-00030 |
| v. ) | |
| ) | Judge Amy J. St. Eve |
| ROBERT JON SCHLYER ) | |
| ) | |

**MEMORANDUM OPINION AND ORDER**

Defendant Robert Schlyer has moved for a judgment of acquittal or, in the alternative, for a new trial. For the reasons explained below, the Court denies Defendant's motions.

**BACKGROUND**

On January 18, 2017, the government charged Schlyer in a three-count indictment (the "Indictment") with two counts of wire fraud and one count of bank fraud. (R. 1, Indictment.) Counts One and Two charged Schlyer with wire fraud for participating in a scheme to defraud and obtain money from individual victims and Amcore Bank in violation of 18 U.S.C. § 1343. Count Three charged Schlyer with bank fraud in connection with the scheme to defraud in violation of 18 U.S.C. § 1344. Essentially, the government alleged that Schlyer knowingly participated in a scheme with Kevin LeBeau and Brian Bodie to fraudulently acquire a $300,000 investment from Delores Palmquist and then use that money, as well as promises of further investments, to induce Amcore Bank ("Amcore") to enter into a forbearance agreement in relation to a property LeBeau and Bodie hoped to develop.

Schlyer pled not guilty to all the Counts. Subsequently, Schlyer proceeded to a four-day jury trial. (R. 81, R. 82, R. 85.) During the trial, the government called the following witnesses: Terry Bohr, Elaine and Preston Brinkman, Patrick Canning, Anne Gallagher, Fred Harbecke,

Margaret Krusing, Robert Kuzma, David Maloney, Mark Oda, Delores Palmquist, Frank Saporito, Edward Seifert, Joseph Sitko, Roger Tepen, Mary Wagner, Ariel Weissberg, Bill Weit, and Douglas Wilson. Schlyer did not testify at trial, but he did call the following witnesses: Michael Ladin, Rhoda Bogardus, Phillipe DeBossu, Steve Hanson, Penny Schlyer, Andy Walzer, Richard Ashbeck, and Barbara Mizones.

On October 6, 2017, the jury returned a verdict of guilty against Schlyer on Counts One, Two, and Three of the Indictment. (R. 86.) Schlyer now moves for a judgment of acquittal or new trial on all the Counts for which he was convicted, pursuant to Federal Rules of Criminal Procedure 29 and 33, respectively.

## LEGAL STANDARD

### I. Motion for a Judgment of Acquittal—Rule 29

Rule 29(a) provides that, "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). When, as here, a defendant makes a Rule 29(a) motion at the close of the government's case, and the court reserves decision, the court "must decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 29(b).

"In challenging the sufficiency of the evidence, [a defendant] bears a heavy, indeed, nearly insurmountable, burden." *United States v. Warren*, 593 F.3d 540, 546 (7th Cir. 2010); *see also United States v. Jones*, 713 F.3d 336, 339-40 (7th Cir. 2013); *United States v. Berg*, 640 F.3d 239, 246 (7th Cir. 2011); *United States v. Dinga*, 609 F.3d 904, 907 (7th Cir. 2010); *United States v. Morris*, 576 F.3d 661, 665-66 (7th Cir. 2009). Indeed, a "defendant faces an uphill battle in challenging the sufficiency of the evidence." *United States v. Orlando*, 819 F.3d 1016,

2

1021 (7th Cir. 2016). The reviewing court will view the "evidence in the light most favorable to the prosecution," and the defendant "'must convince' the court that, even in that light, 'no rational trier of fact could have found him guilty beyond a reasonable doubt.'" *Warren*, 593 F.3d at 546 (quoting *United States v. Moore*, 572 F.3d 334, 337 (7th Cir. 2009)); *see also United States v. Rahman*, 805 F.3d 822, 836 (7th Cir. 2015). In other words, a court will "set aside a jury's guilty verdict only if 'the record contains no evidence, regardless of how it is weighed,' from which a jury could have returned a conviction." *United States v. Presbitero*, 569 F.3d 691, 704 (7th Cir. 2009) (quoting *United States v. Moses*, 513 F.3d 727, 733 (7th Cir. 2008)); *see also Warren*, 593 F.3d at 546.

It follows that under Rule 29, courts "do not reassess the weight of the evidence or second-guess the trier of fact's credibility determinations." *United States v. Arthur*, 582 F.3d 713, 717 (7th Cir. 2009); *see also United States v. Severson*, 569 F.3d 683, 688 (7th Cir. 2009). This strict standard recognizes that "[s]orting the facts and inferences is a task for the jury." *Warren*, 593 F.3d at 547. The Seventh Circuit teaches that:

> [t]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Moore*, 572 F.3d at 337 (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)).

## II.     Motion for a New Trial—Rule 33

Rule 33 of the Federal Rules of Criminal Procedure provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of

justice so requires." Fed. R. Crim. P. 33(a); *see also United States v. Berg*, 714 F.3d 490, 500 (7th Cir. 2013); *United States v. Smith*, 674 F.3d 722, 728 (7th Cir. 2012) (reviewing a district court's order on a Rule 33 motion for abuse of discretion); *United States v. McGee*, 408 F.3d 966, 979 (7th Cir. 2005). "'[C]ourts have interpreted [Rule 33] to require a new trial in the interests of justice in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial.'" *United States v. Eberhart*, 388 F.3d 1043, 1048 (7th Cir. 2004) (quoting *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989)), *overruled on other grounds*, 546 U.S. 12 (2005).

"'A . . . verdict in a criminal case is not to be overturned lightly,'" however, "'and therefore a Rule 33 motion is not to be granted lightly.'" *Eberhart*, 388 F.3d at 1048 (quoting *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994)). The court "may grant a new trial if the jury's verdict is 'so contrary to the weight of the evidence that a new trial is required in the interest of justice.'" *United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999) ("The focus in a motion for a new trial is not on whether the testimony is so incredible that it should have been excluded. Rather, the court considers whether the verdict is against the manifest weight of the evidence, taking into account the credibility of the witnesses."); *see also United States v. Chambers*, 642 F.3d 588, 592 (7th Cir. 2011). In other words, "[t]he court should grant a motion for a new trial only if the evidence 'preponderate[s] heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand.'" *United States v. Swan*, 486 F.3d 260, 266 (7th Cir. 2007) (quoting *United States v. Reed*, 875 F.2d 107, 113 (7th Cir. 1989)); *see also Presbitero*, 569 F.3d at 706.

**ANALYSIS**

**I.      Motion for a Judgment of Acquittal**

Schlyer first argues that the Court should issue a judgment of acquittal for Counts One, Two, and Three.  In order to prove Schlyer guilty of violating 18 U.S.C. § 1343 (Counts One and Two), the government had to prove the following elements beyond a reasonable doubt: (1) that Schlyer knowingly devised or participated in a scheme to defraud; (2) with the intent to defraud; (3) that the scheme involved a materially false or fraudulent pretense, representation or promise; (4) that the scheme affected a financial institution; and (5) that Schlyer used or caused interstate wire communications to take place for the purpose of carrying out the scheme.  *United States v. Marr*, 760 F.3d 733, 744 (7th Cir. 2014); (R. 84, Jury Instructions 17.)  Similarly, in order to prove Schlyer guilty of violating 18 U.S.C. § 1344, the government had to prove the following elements beyond a reasonable doubt: (1) there was a scheme to defraud a bank; (2) the defendant knowingly executed or attempted to execute the scheme; (3) the defendant acted with an intent to defraud; and (4) at the time of the charged offense, the Federal Deposit Insurance Corporation ("FDIC") insured the deposits of the bank.  *United States v. Ajayi*, 808 F.3d 1113, 1119 (7th Cir. 2015) (quoting *United States v. Parker*, 716 F.3d 999, 1008 (7th Cir. 2013)); (R. 84, Jury Instructions 25.)

With regard to Counts One and Two, Schlyer first argues that the evidence was insufficient to prove beyond a reasonable doubt that he knowingly participated in a scheme with the intent to defraud the Palmquists.  With regard to all the Counts, Schlyer argues that there was insufficient evidence to prove that Schlyer knew any of the representations he made to Amcore Bank were false or that Amcore Bank was exposed to a new or increased risk of loss as a result of Schlyer and his co-conspirators alleged scheme.  Schlyer does not dispute that the FDIC

5

insured Amcore's deposits, that the alleged misrepresentations he made were material, or that he used interstate wire communications in the alleged scheme. The Court addresses each argument in turn.

**A. Intent Fraud to Defraud the Palmquists—Counts One and Two**

Schlyer first argues that the government failed to prove that he had an intent to defraud or that he knowingly participated in a scheme to defraud the Palmquists.

"A scheme to defraud requires 'the making of a false statement or material misrepresentation, or the concealment of material fact.'" *United States v. Sloan,* 492 F.3d 884, 890 (7th Cir. 2007) (citation omitted). "An 'intent to defraud' means that the defendant acted willfully and with specific intent to deceive or cheat, usually for the purpose of getting financial gain for himself or causing financial loss to another." *United States v. Pust*, 798 F.3d 597, 600 (7th Cir. 2015) (quoting *United States v. Paneras*, 222 F.3d 406, 410 (7th Cir. 2000)). "However, because direct evidence of a defendant's fraudulent intent is typically not available, specific intent to defraud may be established by circumstantial evidence and by inferences drawn from examining the scheme itself which demonstrate that the scheme was reasonably calculated to deceive persons of ordinary prudence and comprehension." *Id.* at 600-01 (citation omitted).

Several courts have rejected motions for acquittal in cases similar to this where the defendant claimed he had no intent to defraud, but there was sufficient evidence indicating that the defendant took an active role such that jury could have inferred he intended to participate in the fraudulent scheme. In *United States v. Sheneman*, 682 F.3d 623, 625–26 (7th Cir. 2012), for example, a jury found father and son defendants guilty of engaging in an elaborate fraud scheme in which they made false promises to unwitting buyers to induce them to purchase properties they could neither afford or rent out and made misrepresentations to mortgage lenders about the

buyers to induce them to finance the purchases. After the jury found him guilty, the defendant father claimed that he was an unwitting participant in the scheme without knowledge that his son was forging documents and falsifying loan applications. *Id.* at 629. The Seventh Circuit rejected the defendant's argument because there "was ample circumstantial evidence" of his intent to defraud. *Id.* The court explained that there was substantial evidence that the defendant was involved in nearly every aspect of the fraudulent scheme—he induced the buyers to purchase the homes, he referred them to his son for loans, he attended home closings, and was present for his son's meetings with the buyers. *Id.* The court held that this evidence was more than sufficient for the jury to infer, when examining the entirety of the scheme, that the defendant had an intent to defraud. *Id. See also United States v. Betts-Gaston*, 142 F. Supp. 3d 716, 725–26 (N.D. Ill. 2015) (finding sufficient evidence of intent to defraud where there was direct and circumstantial evidence that real estate lawyer structured real estate transactions, created a trust to deceive mortgage lenders, and transferred the property deeds to the trust without notice to lenders, all in an effort to hinder lenders' ability to foreclose on the property).

Here, as in *Sheneman*, there was substantial evidence from which the jury could infer that, in the context of the entire scheme, Schlyer was not an unknowing participant and indeed had an intent to defraud the Palmquists. Like in *Sheneman*, Schlyer was involved in several critical components of the scheme to defraud the Palmquists. Delores Palmquist testified that she made out a check for $300,000 to Schlyer to invest in Schlyer's co-schemers health club property and that Schlyer and his co-schemers provided documents to the Palmquists that indicated these funds would be secured in a trust, for which Schlyer, as LeBeau and Bodie's attorney, would serve as the trustee to ensure the investment was secured. The government also presented documentary evidence that Bodie and LeBeau marketed the investment opportunity to

7

the Palmquists by presenting them with materials that similarly indicated that Schlyer would serve as the trustee over their secured investment. (Palmquist Ex. 1.)

Mrs. Palmquist also testified that Schlyer personally met with her, and at that meeting, he represented that he would serve as trustee over her investment and presented her with investment and trust documents that reflected that Schlyer would serve as trustee over the investment. (Palmquist Ex. 2-4.) When Mrs. Palmquist asked Schlyer about a trust number, he told her she would receive it later. Schlyer did not disclose, and the documents did not indicate, that the property was subject to a foreclosure lawsuit and instead, the documents purported to convey an interest in the property to the Palmquists. Ultimately, however, the government presented evidence that Schlyer did not set up a trust or serve as a trustee over the investment, and instead, an FBI analyst, Margaret Krusing, testified, and documentary evidence established, that Schlyer deposited the Palmquists' funds into a Chase account and later used some of the money for personal expenditures and transferred the remainder of the money to Bodie, LeBeau, and their various entities. (Palmquist Ex. 5-8.)

Viewing this evidence in the light most favorable to the government, there was sufficient evidence for the jury to conclude that Schlyer knowingly participated in a scheme to defraud the Palmquists with the intent to defraud. Like in *Sheneman* and *Betts-Gaston*, while Schlyer may not have been the mastermind behind the scheme, there was substantial evidence indicating that he was involved in many of the critical elements of the fraudulent scheme—he met with the Palmquists, he falsely represented that he would serve as a trustee over their investment, he provided documents indicating the same, he used the Palmquists' funds for personal expenditures, and he re-directed their funds to Bodie and LeBeau. *See Sheneman*, 682 F.3d at 629 (denying motion for judgment of acquittal because there was sufficient evidence that

defendant was involved in every aspect of the fraudulent scheme such that the jury could infer intent to defraud).

### B. Intent to Defraud Amcore—Counts One, Two, and Three

Schlyer next argues that the evidence was insufficient to prove beyond a reasonable doubt that he knowingly participated in a scheme with the intent to defraud Amcore or that he knew that the documents he provided Amcore were false.

Like Schlyer's argument regarding the fraud on the Palmquists, his argument that he did not knowingly participate in a scheme to defraud Amcore also fails because once again, the evidence established that he was involved in several of the critical aspects of the scheme to defraud Amcore. Witnesses testified that, in 2006, Bodie and LeBeau were having trouble making payments on the mortgage with Amcore, and Amcore began threatening foreclosure. After Amcore initiated a foreclosure lawsuit, Schlyer contacted Amcore as Bodie and LeBeau's lawyer and indicated that they wanted to enter into a forbearance agreement with Amcore. Schlyer also filed an appearance in the foreclosure case in December 2006. (Harbecke Ex. 2.) Witnesses testified that in late 2006 and early 2007, Schlyer and Amcore engaged in negotiations regarding a proposed forbearance agreement, and witnesses testified that Amcore informed Schlyer that Bodie and LeBeau needed to make a large payment on the mortgage to convince Amcore to forbear foreclosure. Ultimately, Schlyer entered into a forbearance agreement requiring a $150,000 payment with Amcore on behalf of Bodie and LeBeau in January 2007. (Harbecke Ex. 3.) Schlyer personally provided the $150,000 to Amcore on January 25, 2007, but several Amcore witnesses testified that Schlyer did not inform them that the $150,000 was part of the Palmquists' investment and that to get those funds, they had promised the Palmquists an interest in the property, in violation of the mortgage.

9

Later, Schlyer attempted to convince Amcore to enter into an extension of the forbearance agreement by providing forged subscription agreements from individuals who had not agreed to invest in the LeBeau property. Schlyer also sent Amcore a letter falsely representing that Bodie and LeBeau had raised $1.55 million in funds from investors and that the development on the property would move forward shortly. (Harbecke Ex. 5-6.) Once again, there was substantial evidence, both from witnesses and documents, establishing that these representations were false, and that Schlyer made these fraudulent claims in an effort to induce Amcore to extend the forbearance agreement.

Viewing all this evidence in the light most favorable to the government, like with the scheme to defraud the Palmquists, there was sufficient evidence for the jury to conclude that Schlyer knowingly and with intent to defraud participated in a scheme to defraud the Amcore Bank. As in *Sheneman* and *Betts-Gaston*, there was substantial evidence indicating that Schlyer was involved in many of the critical elements of the fraudulent scheme—he represented Bodie and LeBeau in the foreclosure case, he negotiated the forbearance agreement with Amcore, he provided the funds to support the forbearance agreement without disclosing the fraudulent source of the funds, and he provided Amcore with documents containing false promises about new investors in the property. Based on this evidence, a "rational trier of fact" certainly could have reasonably found that Schlyer knowingly and with intent participated in a scheme to defraud Amcore. *Moore*, 572 F.3d at 337.

**C. Scheme Affected Financial Institution**

Schlyer also argues that the evidence was insufficient to prove that Schlyer's scheme to defraud affected Amcore, or put differently, exposed Amcore to a new or increased risk of loss,

10

because Amcore's strategy, regardless of Schlyer's scheme, was to delay foreclosing on the property so it could sell the property to a third party.

Here, there was sufficient evidence for the jury to reasonably conclude that Schlyer and his co-schemers fraudulent scheme exposed Amcore to a new or increased risk of loss. *Marr*, 760 F.3d at 744 (a scheme affects a financial institution when it exposes the institution to new or increased risk of loss). While Amcore may have wanted to sell the property to a third party, the government presented evidence that Schlyer and his co-schemers provided fraudulent information and made material omissions to Amcore—including information about potential investors and omissions about the source of the funds they were using to delay foreclosure—and the Amcore witnesses testified that these fraudulent and misleading statements caused Amcore to delay foreclosure and enter into a forbearance agreement. The government also presented evidence that Amcore ultimately sold the property for $375,000, despite the fact that Bodie and LeBeau's took out a nearly $2 million loan from Amcore. Viewing this evidence in the light most favorable to the government, the jury could have reasonably concluded that, even if Amcore was considering multiple options for recouping the value of the property, Schlyer and his co-schemers fraud still exposed Amcore to a new or increased risk of loss. *United States v. Fleifel*, No. 3:12-CR-318-D(3), 2015 WL 5567008, at *4 (N.D. Tex. Sept. 22, 2015) (finding sufficient evidence of effect on financial institution where one witness testified about the financial institution's exposure to loss).

### D. Credibility of Amcore Witnesses

Finally, Schlyer argues that the Amcore Bank witnesses—David Maloney and Roger Tepen—were not credible because they did not disclose to their attorney that they were trying to sell the property to a third party. Schlyer argues that, due to their lack of credibility, the

evidence was insufficient to show that Schlyer fraudulently induced Amcore into entering into the forbearance agreement.

Under Rule 29, courts "do not reassess the weight of the evidence or second-guess the trier of fact's credibility determinations." *United States v. Arthur*, 582 F.3d 713, 717 (7th Cir. 2009). With regard to witness credibility specifically, the Seventh Circuit has explained that it is "distinctly within the province of the jury to weigh the consistency of [a witness's] testimony and assess his overall credibility." *United States v. Elder*, 840 F.3d 455, 460-61 (7th Cir. 2016). Put differently, "it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts and draw reasonable inferences." *United States v. Hagan*, 913 F.2d 1278, 1281 (7th Cir. 1990) (quotations and citations omitted); *see also Kuzniar*, 881 F.2d at 470–71 ("It is axiomatic that, absent exceptional circumstances, issues of witness credibility are to be decided by the jury, not the trial judge. . . [t]he exception is an extremely narrow one, however, and can be invoked only where the testimony contradicts indisputable physical facts or laws.").

Here, it was well within the province of the jury to weigh the testimony of the Amcore Bank witnesses in the context of all the evidence presented and conclude that they were credible in testifying that Schlyer and his co-schemers fraudulent statements and omissions induced Amcore to enter into the forbearance agreement. As noted above, it is the jury's role to "resolve evidentiary conflicts and draw reasonable inferences." *Hagan*, 913 F.2d at 1281. Here, while Maloney and Tepen may not have disclosed every aspect of Amcore's strategy to Harbecke, that did not preclude the jury from finding that they credibly testified that Schlyer and his co-schemers false information induced them to enter into the forbearance agreement. Similarly, while the Problem Loan Status Reports may have indicated that some Amcore employees had some awareness of mortgage issues with the property, the jury still could have considered the

entirety of the evidence, drawn sensible inferences, and reasonably concluded that the information Schlyer and his co-schemers provided regarding the source of their funds, potential investors, and the mortgage status of the property impacted Amcore's decision to enter into the forbearance agreement. Accordingly, viewing the evidence in the light most favorable to the government, there was sufficient evidence for the jury to reasonably conclude that the Amcore witnesses were credible and that Schlyer fraudulently induced them into entering into the forbearance agreement. *United States v. Jarrett,* 447 F.3d 520, 530 (7th Cir. 2006) ("a trial judge does not sit as a 13th juror to evaluate the credibility of a witness . . .").

In sum, as the Seventh Circuit has noted, "[i]n challenging the sufficiency of the evidence, [a defendant] bears a heavy, indeed, nearly insurmountable, burden." *Warren*, 593 F.3d at 546. Here, viewing the "evidence in the light most favorable to the prosecution," there was sufficient evidence for a rational jury to find that Schlyer was an integral participant in the scheme to defraud Amcore and the Palmquists and that he participated in the scheme knowingly and with intent, causing financial loss to both Amcore and the Palmquists. *Warren*, 593 F.3d at 546. The Court thus denies Schlyer's motion for a judgment of acquittal.

## II. Motion for a New Trial

In his motion for a new trial, similar to his motion for a judgment of acquittal, Schlyer argues that the government failed to prove that he knowingly participated in a scheme to defraud with the requisite intent and that the alleged scheme did not expose Amcore Bank to a new or increased risk of loss because Amcore's own strategy caused its delay. Schlyer also argues that the government improperly argued during closing argument that the defense counsel was blaming the victims. Finally, Schlyer argues that the Amcore Bank witnesses were not credible given the entirety of the evidence. The Court addresses each argument in turn.

### A. Insufficiency of the Evidence re Intent and Amcore's Loss

The Seventh Circuit has explained that the "court should grant a motion for a new trial only if the evidence 'preponderate[s] heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand.'" *Swan*, 486 F.3d at 266 (quoting *Reed*, 875 F.2d at 113). As discussed at length above, the evidence here did not "preponderate heavily against a [guilty] verdict." *Id.* Instead, the government presented sufficient evidence from which the jury could reasonably have concluded that Schlyer had the intent to commit fraud and that Amcore suffered a financial loss. The government presented evidence, for example, that Schlyer worked with his co-schemers Bodie and LeBeau, to obtain a forbearance agreement from Amcore, which caused Amcore to delay foreclosure and sale of the property, using funds fraudulently obtained from the Palmquists by falsely promising them that the property at issue would be put into a trust. Moreover, the jury could have reasonably concluded from both witnesses—Delores Palmquist, Fred Harbecke, David Maloney, and others—and documentary evidence—the forbearance agreement and the Palmquist investment documents—that Schlyer was directly involved in negotiations with Amcore and directly involved in negotiations with the Palmquists, and thus had the intent to defraud. Similarly, as discussed above, there was sufficient evidence to support a finding that Schlyer and his co-schemes fraudulent scheme exposed Amcore to an increased risk of loss.

Accordingly, the Court denies Schlyer's motion for a new trial due to the insufficiency of the evidence.

### B. Victim-Blaming Argument

Schlyer argues that it was improper for the government to argue in rebuttal that his counsel was "blaming the victims" because this argument unfairly undermined Schlyer's valid

arguments regarding the absence of the Palmquists' signatures on the documents they received from Schlyer and regarding the actual damage done to Amcore Bank. A court's analysis of improper prosecutorial comments during closing arguments requires "first a determination that prosecutors acted improperly, and second a conclusion that the improper conduct prejudiced the defendant." *United States v. Richards*, 719 F.3d 746, 764 (7th Cir. 2013) (citations omitted). To determine that the government's statement prejudiced Schlyer, the Court must weigh the following factors: "(1) whether the prosecutor misstated the evidence; (2) whether the statements implicate a specific right of the defendant; (3) whether the defense invited the prosecutor's remarks; (4) the trial court's instructions; (5) the weight of the evidence against the defendant; and (6) the defendant's opportunity to rebut." *Richards*, 719 F.3d at 766.

During Schlyer's closing, his counsel argued, in part, that the Palmquists should have been more savvy in investing with Schlyer and his co-schemers, that the absence of their signatures on key documents indicated that the parties were still negotiating, and that Amcore should have sold the property earlier, but instead lost more money because it was trying to "squeeze every penny" out of the property. The Court sustained government objections to Schlyer's argument about the meaning behind the missing Palmquist signatures and to the argument that Amcore could have but chose not to sell the property sooner. Then, during the government's rebuttal, in response to Schlyer's broader arguments in closing about mistakes the Palmquists and Amcore made in their transactions with Schlyer and his co-conspirators, the government discussed Schlyer's theories of defense and argued, in part, that the jury should not blame the Palmquists or the bank for the fraud Schlyer perpetrated on them.

Here, Schlyer's argument fails because the government's arguments were not improper. The government did not attack defense counsel or Schlyer personally, nor did the government

15

imply that defense counsel had acted improperly, and Schlyer's counsel did not object to the government's argument in rebuttal. Instead, the government's arguments were a direct response to the broad defense theory that the Palmquists' naivety and the bank's poor business decisions made Schlyer less culpable. Indeed, contrary to Schlyer's argument that his counsel did not "blame the victim" in his closing, Schlyer's counsel did attempt to argue that Amcore's greed prevented it from selling the property earlier, that the Palmquists should have been more savvy in reviewing the transaction documents, and that the missing signatures raised questions about the government's theory of the case. The government's argument in rebuttal was a permissible response to Schlyer's arguments and relied on a correct statement of the law—a fraud victim's naivety or greed does not lessen the culpability of the person who commits fraud. *United States v. Coffman*, 94 F.3d 330, 334 (7th Cir. 1996) (rejecting victim-blaming defense theory and noting that "picking on the vulnerable normally makes your conduct more rather than less culpable"); *United States v. Thomas*, 377 F.3d 232, 243 (2d Cir. 2004) (a victim's negligence or gullibility "is not relevant to the inquiry as to whether the defendants were properly convicted").

Accordingly, the Court denies Schlyer's motion for a new trial due to the government's arguments regarding "victim-blaming."

### C. Credibility of Victim Bank Witnesses

Finally, as in his motion for a judgment of acquittal, Schlyer argues that the Court should reject the jury's determination that the Amcore Bank witnesses were credible and find that the witnesses' testimony was false. Specifically, Schlyer argues that the Amcore witnesses falsely testified that they did not have knowledge of the property's liens and the mortgage violations because the Problem Loan Status Reports indicated that the Amcore witnesses had knowledge of liens, thus undermining their testimony that Amcore would not have entered into the forbearance

16

agreement had they known of these defects. Further, Schlyer claims that the Amcore witnesses falsely testified that they had an interest in the source of the funds used to secure the forbearance agreement.

Schlyer's argument is unavailing. As explained above, it is "distinctly within the province of the jury to weigh the consistency of [a witness's] testimony and assess his overall credibility." *Elder*, 840 F.3d at 460-61; *see also United States v. Muthana*, 60 F.3d 1217, 1223 (7th Cir. 1995) ("Assessing a witness'[s] credibility is a matter inherently within the province of the jury.")); *Kuzniar*, 881 F.2d at 470–71 ("It is axiomatic that, absent exceptional circumstances, issues of witness credibility are to be decided by the jury, not the trial judge. . . [t]he exception is an extremely narrow one, however, and can be invoked only where the testimony contradicts indisputable physical facts or laws.").

Schlyer has not satisfied his "extremely narrow" burden of showing that the Amcore witnesses testimony "contradict[ed] indisputable physical facts or laws." *Id.* The fact that the Problem Loan Status Reports may have indicated that Amcore, or some Amcore employees, had some awareness of mortgage issues with the property, did not preclude the jury from concluding that the Amcore witnesses—Harbecke, Maloney, and Tepen—were credible when they testified that the fraudulent information Schlyer and his co-schemers provided regarding the source of their funds and the mortgage status of the property impacted Amcore's decision to enter into the forbearance agreement. Simply put, "conflicting testimony or a question as to the credibility of a witness are not sufficient grounds for granting a new trial." *Kuzniar*, 881 F.2d at 471. Here, a reasonable jury could have concluded that the Amcore witnesses were credible. *Jarrett*, 447 F.3d at 530 ("a trial judge does not sit as a 13th juror to evaluate the credibility of a witness. . .").

17

Accordingly, the Court denies Schlyer's motion for a new trial due to the Amcore witnesses' purportedly false testimony.

**CONCLUSION**

For the foregoing reasons, the Court denies Schlyer's motion for a judgment of acquittal and for a new trial.

**Dated:** January 30, 2018

_____
AMY J. ST. EVE
United States District Court Judge